FILED
9/3/2019
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MOHAMED ABDELKADIR, individually and as limited guardian ad litem for SERGO ABDELKADIR, and REYA AREY,

Appellants,

v.

SEATTLE SCHOOL DISTRICT,

Respondent.

DIVISION ONE

No. 78628-8-I

UNPUBLISHED OPINION

FILED: September 3, 2019

DWYER, J. — After an unsuccessful administrative appeal from the denial of their daughter's nonresident enrollment application to the Seattle School District (the District), Mohamed Abdelkadir and Reya Arey[1] commenced this action, asserting that the District violated the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, and that the District breached a settlement agreement. The trial court granted summary judgment dismissal to the District, accepting its contention that the Parents' WLAD claim was barred by either claim or issue preclusion, and that there was no basis to assert that the District had breached a settlement agreement. We affirm.

---

[1] For simplicity, we will refer to the appellants as the "Parents" unless context requires otherwise.

I

S.A. resides with her parents, Mohamed Abdelkadir and Reya Arey, in the Shoreline School District. For several years she was permitted to enroll in a Seattle elementary school as a nonresident student. Each year she needed to reapply for nonresident enrollment for the next school year. She most recently attended a District school during the 2015-16 academic year, when she completed the fifth grade.

S.A. has a learning disability that makes her eligible for special education. After S.A. entered the fifth grade, the Parents and the District disputed the magnitude of S.A.'s disability and the services that she required. After mediation, the parties signed a settlement agreement, pursuant to which the Parents would arrange for S.A. to receive an independent education evaluation (IEE), paid for by the District, which would then be considered in developing a new Individualized Education Plan (IEP). Despite selecting a professional to conduct it, the Parents never arranged the IEE. However, as S.A. completed the fifth grade, the parties developed an IEP for the following school year, which provided for S.A. to receive three 30-minute sessions each month from a speech language pathologist (SLP).

Subsequently, the Parents submitted S.A.'s nonresident student enrollment application for the 2016-17 school year. The application was referred to the District's special education department to determine whether there would be sufficient capacity, both in the classroom and in the SLP program, to enroll S.A. at one of the middle schools she requested. At this time, the District's ability

2

to admit nonresidents was limited by a severe shortage of SLP staff to serve the anticipated number of resident students who would require SLP involvement. Thus, the District-wide SLP team leader recommended declining *all* nonresident student applications for students requiring SLP services.

On July 8, 2016, the Parents received a letter denying S.A.'s application, giving the following grounds for the decision:

> We have determined that available capacity (if any) at the school grade and/or program is needed to accommodate anticipated needs of resident students; [and]
>
> Accepting this student would create a financial hardship for SPS.[2]

Pursuant to chapter 28A.225 RCW, the Parents appealed the District's denial of S.A.'s nonresident enrollment application to the Office of the Superintendent of Public Instruction (OSPI). An adjudicatory hearing was held over two days—October 11 and November 8, 2016—before an administrative law judge (ALJ). From the evidence, the ALJ found as a fact that all nonresidential transfer applications from students requiring SLP services had been denied for the 2016-17 school year and that this was due to the District's inability to fill SLP staff positions.[3] The ALJ also found that the unavailability of SLPs district-wide, and not solely at S.A.'s requested middle schools, was a proper consideration, as the District was actively mitigating its shortage by re-assigning students from SLPs with high caseloads to those with lower caseloads.

---

[2] Seattle Public Schools.

[3] The District's collective bargaining agreement in effect at the time set a targeted maximum caseload of 47 students per SLP. In the fall of 2016, nearly half of the District's SLPs had caseloads above this maximum. Furthermore, based on experience, the District anticipated an increase in students requiring SLP services during the school year.

The ALJ also reviewed the District's nonresident student enrollment policy, adopted pursuant to RCW 28A.225.225, a statute that limits the discretion of school districts to accept or reject nonresident students.[4] This policy allows the District's superintendent to accept or reject an application for nonresident admission based on certain standards including, but not limited to,

A. Whether space is available in the grade level or classes at the building in which the student desires to be enrolled;

B. Whether appropriate educational programs or services are available to improve the student's condition as stated in requesting release from his or her district of residence;

. . .

D. Whether the student's acceptance would constitute a financial hardship for the district.

---

[4] The pertinent subsection of the statute, RCW 28A.225.225, provides as follows:
(4) Except as provided in subsection (1) of this section, all districts accepting applications from nonresident students or from students receiving home-based instruction for admission to the district's schools shall consider equally all applications received. Each school district shall adopt a policy establishing rational, fair, and equitable standards for acceptance and rejection of applications by June 30, 1990. The policy may include rejection of a nonresident student if:
(a) Acceptance of a nonresident student would result in the district experiencing a financial hardship;
(b) The student's disciplinary records indicate a history of convictions for offenses or crimes, violent or disruptive behavior, or gang membership;
(c) Accepting of the nonresident student would conflict with RCW 28A.340.080; or
(d) The student has been expelled or suspended from a public school for more than ten consecutive days. Any policy allowing for readmission of expelled or suspended students under this subsection (4)(d) must apply uniformly to both resident and nonresident applicants.
For purposes of subsection[] . . . (4)(b) of this section, "gang" means a group which: (i) Consists of three or more persons; (ii) has identifiable leadership; and (iii) on an ongoing basis, regularly conspires and acts in concert mainly for criminal purposes.

The ALJ recited relevant portions of the District superintendent's Procedures for Student Assignment that implement the nonresident enrollment policy:

> [Pursuant to Board Policy 3141,] SPS enrolls non-resident students as long as the anticipated needs of resident students are met first; acceptance of the non-resident student does not create a financial hardship for SPS; . . .
>
> Completed applications are generally processed in the order received, although priority consideration may be given for applicants who attend SPS in the school year immediately preceding the application. Non-residents may only be assigned to schools/grades/programs that have seats available and that are not closed to non-residents. . . .

The ALJ rejected all of the Parents' challenges to the District's decision, ruling that:

> Consistent with RCW 28A.225.225(4), the District has adopted a written policy establishing criteria for enrollment of nonresident students. The District's acceptance of nonresident students, subject to capacity, is rationally related to its legitimate interest in meeting the needs of its resident students first. The policy is fair in that it is an objective and uniform standard applied to all applicants.

OSPI, as an executive branch administrative agency, is not vested with authority to impose remedies for violation of the WLAD. Thus, the ALJ did not rule on the merits of the Parents' claim that the policy, as applied to S.A., was in contravention of the WLAD. However, in determining the issues presented, the ALJ did rule that the District's policy was "fair and equitable under equal protection standards," and that "[t]he 'discrimination' that is occurring is between resident students who need SLP services and nonresident students who need those services." The ALJ rejected various of the Parents' proffered plans, which

purported to defray the cost of S.A.'s enrollment, as inconsistent with the statute. The ALJ concluded:

> [T]here is no legal basis to overturn the District's decision. While the Parent may have good reasons for wanting the Student to attend school in the District, this tribunal is without authority to create additional bases, not authorized by the Legislature, for requiring a school district to accept nonresident students. Likewise, the District is without authority, under its own policy, to admit nonresident students when it lacks capacity to fully serve its own resident student[s], or to treat one nonresident applicant on an unequal basis from other nonresident applicants.

On review, the superior court affirmed the administrative decision. While that superior court decision was pending, the Parents commenced this action in the same court. First alleging only a WLAD violation, the Parents later amended the complaint to add a cause of action for breach of contract, due to what they perceived as the District's failure to pay for S.A.'s forgone IEE under the parties' 2015 settlement agreement. The trial court granted summary judgment to the District, dismissing all of the Parents' claims. In doing so, it accepted the District's assertion that the WLAD claim was precluded by either res judicata or collateral estoppel, although it did not specify which doctrine properly applied. The court also ruled that the breach of contract claim was unfounded given that the Parents never fulfilled the condition on which the District's performance was predicated. The Parents now appeal.

## II

The Parents contend that their WLAD claim was not barred by collateral estoppel, as the ALJ analyzed whether discrimination took place through the lens

6

of the school choice statute and not the WLAD. However, their present claim is indeed an attempt to relitigate ultimate facts found adversely to them by the ALJ.

We review a summary judgment order de novo. Lokan & Assocs., Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 495, 311 P.3d 1285 (2013). Thus, we engage in the same inquiry as the trial court, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Brown v. Brown, 157 Wn. App. 803, 812, 239 P.3d 602 (2010). "[Summary judgment] should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Mayer v. City of Seattle, 102 Wn. App. 66, 75, 10 P.3d 408 (2000).

We also review de novo whether collateral estoppel bars a particular legal claim. Christensen v. Grant County Hosp. Dist. No. 1, 152 Wn.2d 299, 305, 96 P.3d 957 (2004). Collateral estoppel promotes judicial economy, serves to prevent inconvenience or harassment of parties, and implicates principles of repose and concerns about the resources expended in repetitive litigation. Christensen, 152 Wn.2d at 306-07. Collateral estoppel may only preclude those issues that have been actually litigated and necessarily and finally determined in an earlier proceeding. Christensen, 152 Wn.2d at 307; Shoemaker v. City of Bremerton, 109 Wn.2d 504, 507, 745 P.2d 858 (1987).

> "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."

Nielson v. Spanaway Gen. Med. Clinic, Inc., 135 Wn.2d 255, 262, 956 P.2d 312 (1988) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (AM. LAW INSTITUTE 1982)).

To establish that collateral estoppel bars a particular claim, four elements must be proved:

> (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding; (2) the earlier proceeding ended in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding; and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

Christensen, 152 Wn.2d at 307. Furthermore, the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. Christensen, 152 Wn.2d at 307 (citing Nielson, 135 Wn.2d at 264-65).

Courts have frequently applied collateral estoppel to issues adjudicated in an earlier administrative proceeding. Christensen, 152 Wn.2d at 307. Our Supreme Court has explained that "'[t]o hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution.'" Christensen, 152 Wn.2d at 308 (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107-08, 111 S. Ct. 2166, 115 L. Ed. 2d 96 (1991)).

The mere fact that unsuccessfully pursuing an administrative adjudication may ultimately preclude a later tort claim due to an agency's factual findings does

not prevent the application of collateral estoppel. Christensen, 152 Wn.2d at 312-13.[5] As our Supreme Court explained, "[T]his is the essence of collateral estoppel. There is nothing inherently unfair about this result provided the party has the full and fair opportunity to litigate, there is no significant disparity of relief, and all the other requirements of collateral estoppel are satisfied." Christensen, 152 Wn.2d at 313.

Here, of the four elements, the Parents argue that two bar collateral estoppel: they claim that the issues were not identical and that applying collateral estoppel would result in an injustice. To the contrary, the ultimate facts, and the applicable legal standard governing the dispositive issue, remain unchanged between the administrative adjudication and the present action. No injustice results from applying collateral estoppel herein.

A

The Parents first argue that the issues contested in the administrative adjudication and this civil lawsuit are not identical because the ALJ determined only whether discrimination occurred in violation of RCW 28A.225.225, whereas the WLAD claim involved a different standard. This argument fails because the Parents relied on the same necessary facts in superior court as they did in the administrative proceeding, and because the claimed difference between the two

---

[5] Three additional criteria apply when applying collateral estoppel to an administrative decision: "'(1) whether the agency acting within its competence made a factual decision; (2) agency and court procedural differences; and (3) policy considerations.'" Reninger v. State Dep't of Corr., 134 Wn.2d 437, 450, 951 P.2d 782 (1998) (internal quotation marks omitted) (quoting Stevedoring Servs., of Am., Inc. v. Eggert, 129 Wn.2d 17, 40, 914 P.2d 737 (1996)). Because the Parents do not base their appellate argument on any of these additional criteria, we need not further discuss them.

standards is illusory. The ALJ's findings of fact had a proper preclusive effect in the superior court action.

> [A]pplication of collateral estoppel is limited to situations where the issue presented in the second proceeding is identical in all respects to an issue decided in the prior proceeding, and "where the controlling facts and applicable legal rules remain unchanged." Further, issue preclusion is appropriate only if the issue raised in the second case "involves substantially the same bundle of legal principles that contributed to the rendering of the first judgment," even if the facts and the issue are identical.

Lopez-Vasquez v. Dep't of Labor & Indus., 168 Wn. App. 341, 345-46, 276 P.3d 354 (2012) (alteration in original) (quoting LeMond v. Dep't of Licensing, 143 Wn. App. 797, 805, 180 P.3d 829 (2008)).

Resolution of the Parents' administrative dispute with the District required the ALJ to determine whether the District's enrollment policy was discriminatory as applied to S.A. The relevant question for determining the existence of discrimination therein was whether the District's policy established "rational, fair, and equitable standards for acceptance and rejection" of nonresident student enrollment applications and considered S.A.'s application equally alongside all other nonresidents. RCW 28A.225.225(4). If the standards were not met, RCW 28A.225.230 (governing appeals of nonresident enrollment denials) would mandate S.A.'s enrollment in the District.

WAC 392-137-205(1)(b) provides guidance when implementing RCW 28A.225.230. It states: "The requirement to consider all applications equally does not preclude the establishment of a priority system that is fair and equitable under equal protection standards." WAC 392-137-205(1)(b).

10

Thus, to prevail, the Parents had to show that the District's standards were not "rational, fair, and equitable" and that the priority system adopted was not "fair and equitable under equal protection standards." Concluding that the Parents failed to meet this burden, the ALJ did more than simply conclude that the District's rule complied with the statute. The ALJ analyzed each of the questions of fact purporting to preclude the rule's application. The ALJ also analyzed the Parents' proffered accommodations to circumvent the effect of the District's policy. The ALJ found the facts in a manner that supported the District's decisions.

The legal issues on which the instant WLAD lawsuit is predicated are identical to those in the administrative hearing. The WLAD recognizes a right to be free from discrimination based on the presence of any sensory, mental, or physical disability. RCW 49.60.030(1)(b). Our Supreme Court has stated that the WLAD's "prohibition against discrimination stems from the constitutional requirement for equal protection." Fell v. Spokane Transit Auth., 128 Wn.2d 618, 634, 911 P.2d 1319 (1996). Noting that this principle applies to disabled individuals, the Fell court held that "there is discrimination only when the disabled are not provided with comparable services." 128 Wn.2d at 635.

The court reasoned that

> [i]f the public accommodation is synonymous with the entire service area of the governmental unit and comparable treatment is not the analytical touchstone, there is no basis upon which a governmental body or a business could *not* do more to provide services to a disabled person. There is no principled basis for a governmental body ever to reduce or adjust services. To agree with the plaintiffs' approach would be to effectively legislate an unrestricted right to services. The certain result would be endless litigation over alleged

service entitlements, with the decision as to how an agency must allocate its resources left to the judiciary, the branch of government by design furthest removed from the will of the people.

Fell, 128 Wn.2d at 636-37.

In turn, we have clarified that, when the provision of similar treatment to individuals with and without disabilities would defeat the purposes of WLAD, "reasonable accommodation" must be made for an individual's disability. Negron v. Snoqualmie Valley Hosp., 86 Wn. App. 579, 586, 936 P.2d 55 (1997).[6]

To demonstrate a prima facie case of discrimination in public accommodation, the plaintiff must prove:

> (1) the plaintiff is a member of a protected class, (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the plaintiff's protected status was a substantial factor that caused the discrimination.

Floeting v. Grp. Health Coop., 192 Wn.2d 848, 853, 434 P.3d 39 (2019) (citing Fell, 128 Wn.2d at 637).

Here, the ALJ's findings of fact, unchallenged by the Parents in the administrative appeal, preclude a conclusion that the third element could be met—that S.A. was discriminated against by receiving treatment not comparable to that provided to individuals without disabilities. See Fell, 128 Wn.2d at 637. To succeed on their WLAD claim, the Parents would need to prove that the

---

[6] "'Reasonable accommodation'" is defined as "'action, *reasonably possible in the circumstances*, to make the regular service of a place of public accommodation accessible to persons who otherwise could not use or fully enjoy the services because of the person's sensory, *mental, or physical* disability.'" Wash. State Commc'n Access Project v. Regal Cinemas, Inc., 173 Wn. App. 174, 194, 293 P.3d 413 (2013) (some emphasis omitted) (quoting WAC 162-26-040(2)).

District did not accommodate S.A.'s disability to the extent reasonably possible when it declined to enroll her. This is the core assertion that the ALJ found to be unsupported by the facts when rejecting the Parents' challenge to the District's enrollment policy. While that challenge and the WLAD claim have distinct elements, the Parents rely on the same underlying dispositive facts for both.

To determine whether discrimination took place, the ALJ had to determine whether the District's policy met equal protection standards as applied to S.A. This meant that the ALJ had to make a finding as to whether the District discriminated against S.A. by failing to afford comparable treatment—the same test that would be employed in a WLAD action to rule on the contested third element of such a claim. The ALJ's findings of fact on this question foreclose a ruling in favor of the Parents on the WLAD claim. Thus, the trial court correctly ruled that identity of issues existed between the administrative and civil proceedings.

### B

The Parents next aver that, even if the issues before the ALJ and the superior court were identical, applying collateral estoppel would work an injustice because it would prevent them from putting forth what they claim to be new evidence that would undermine the District's reasons for enforcing its policy to S.A.'s detriment. To the contrary, because this "evidence" is neither relevant to nor at odds with the ALJ's determination, and because the Parents had a full and fair opportunity to litigate the issue in the administrative proceeding, there is no injustice in applying collateral estoppel.

While courts should not apply collateral estoppel when it would work an injustice, this "component is generally concerned with procedural, not substantive irregularity." Christensen, 152 Wn.2d at 309. The Supreme Court has explained that "the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the first forum," so "applying collateral estoppel may be improper where the issue is first determined after an informal, expedited hearing with relaxed evidentiary standards." Christensen, 152 Wn.2d at 309. The injustice factor "'recognizes the significant role of public policy,'" but the mere fact that an administrative proceeding may ultimately preclude a later tort claim due to the agency's factual findings should not prevent courts from applying collateral estoppel. Christensen, 152 Wn.2d at 309 (quoting State v. Vasquez, 148 Wn.2d 303, 309, 59 P.3d 648 (2002)).

The Parents identify three differences between the administrative proceeding and this case that, they contend, render unjust the application of collateral estoppel. First, they argue that the ALJ did not possess the power to inquire into the existence of disability discrimination at all, but was limited to determining the parties' rights under the school choice statute—an argument wholly addressed and foreclosed by the analysis above, as determining said rights required finding whether disability discrimination took place.

Second, the Parents note that the District does not contend that admitting S.A., individually, would work a financial hardship upon the District, and that it has admitted that her admission would not necessarily displace any District students. This, the Parents contend, undermines the District's bases for denying

S.A.'s application. The Parents point to the District's disclosures in discovery in this case to support their assertion that, because admitting S.A., individually, would not work a financial hardship upon the District and that no resident student would necessarily be displaced as a result of S.A.'s admission, the District had no legitimate reason for denying her application. They also appear to assert that, because the Shoreline School District admitted three nonresident students from the Seattle School District who required SLP services, S.A. is entitled to one of the three "spaces" vacated by these students.

It is plain that none of these facts would have modified the ALJ's ruling had these contentions been raised in that litigation. Indeed, the ALJ had in fact considered, and rejected, the cost argument, accounting for the notion that admitting S.A., individually, would not work a hardship.

> [T]he Parent argues that the financial burden of this one Student's SLP services is small, and the penalty from the union contract for overloading an SLP by one student is also small: $75 per year. The Parent's argument is misplaced. This one Student cannot be considered in isolation. It is not the cost of one, but the cost of all nonresident applicants who require SLP services that must be considered, because the law requires equal treatment of all similarly-situated applicants.

Similarly, the ALJ rejected the contention that the possibility that S.A.'s admission would not necessarily mandate that a resident student be displaced meant that the District *had* to admit S.A.

> [The] District did exactly what its policy requires. That policy provides: "SPS enrolls non-resident students as long as the *anticipated* needs of resident students are met first." . . . It is rational for the District to take into account not just resident needs at the time a nonresident applies, but anticipated resident needs during the full school year for which the nonresident seeks admission. In this case, the District used consistent historical data

15

to anticipate 4.7% growth over the course of the school year in the number of students needing SLP services.

The Parents' reference to this new "evidence" is merely an attempt to relitigate the ALJ's findings of fact.

> An issue on which relitigation is foreclosed may be one of evidentiary fact, of "ultimate fact" (i.e., the application of law to fact), or of law. . . . Thus, for example, if the party against whom preclusion is sought did in fact litigate an issue of ultimate fact and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact.

RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (AM. LAW INSTITUTE 1982). The Parents' arguments give no basis for departing from this rule. The trial court was correct to decline to readjudicate the ALJ's findings of fact.

Third, the Parents also aver that applying collateral estoppel would work an injustice because the ALJ did not consider their proffered methods of accommodating S.A. in the context of the WLAD, but only in the context of the school choice statute. However, there is no viable argument as to why these purported accommodations—actually requests for special treatment—would be analyzed differently under the WLAD. Initially, the Parents focus on the rejection of their offer to pay the cost of speech therapy. In rejecting this proposal, the ALJ stated:

> [T]he Parent offered to pay the District the cost of providing his daughter's SLP services. Were the District to grant nonresident admission only to parents wealthy enough to make such payments, the District would violate the statute requiring it to "consider equally all applications." RCW 28A.225.225(4).[7]

---

[7] Arguing that S.A. is nevertheless entitled to such an arrangement under WLAD places the Parents in the same situation as the plaintiff in <u>Hartleben v. University of Washington</u>, 194

All of the Parents' other proposed "accommodations," in addition to being barred by statute, would result in S.A. being treated with privileges not only greater than those enjoyed by students without her disability, but greater than that which other nonresident students with the same disability enjoy. From the fact that the ALJ ruled out each on grounds independent of the WLAD, it does not follow that preclusion of their relitigation in a WLAD action, when that law does not support them, would work an injustice.

III

Finally, the Parents contend that the trial court should not have dismissed their breach of contract claim with prejudice. To prevail on a breach of contract claim, the plaintiff must show an agreement between the parties, a parties' duty under the agreement, and a breach of that duty. Fid. & Deposit Co. of Md. v. Dally, 148 Wn. App. 739, 745, 201 P.3d 1040 (2009). "Settlement agreements are governed by contract principles 'subject to judicial interpretation in light of the language used and the circumstances surrounding their making.'" Sherrod v. Kidd, 138 Wn. App. 73, 75, 155 P.3d 976 (2007) (quoting Stottlemyre v. Reed, 35 Wn. App. 169, 171, 665 P.2d 1383 (1983)).

---

Wn. App. 877, 378 P.3d 263 (2016). Therein, a graduate student suffered serious retrograde amnesia that caused her to have no memory of taking five courses in her program. Hartleben, 194 Wn. App. at 879. She contended that being allowed to retake these five courses, without paying tuition, would be a reasonable accommodation of her disability. Hartleben, 194 Wn. App. at 880. However, evidence showed that all students at the University were required to pay tuition, and that a tuition waiver was a request for "extra services that [the University] does not offer to other students." Hartleben, 194 Wn. App. at 886. Citing to Fell, the court reiterated that "[t]he WLAD does not require a place of public accommodation to provide greater services to people with disabilities than what is available to people without disabilities." Hartleben, 194 Wn. App. at 886.

Here, the parties had a settlement agreement pursuant to which the District would "pay for an independent educational evaluation by a mutually-agreed-upon evaluator outside the [D]istrict who is on the [D]istrict's list of IEE providers." District Special Education Supervisor Sherry Studley, who was involved with the mediation process and signed the parties' mediation agreement, stated under oath that

> [t]he family needed to identify a qualified individual to conduct the evaluation, which they did. And I needed to set up a personal services contract with that individual, which I did. And I notified Dr. Garcia that he could commence with the evaluation, and I left a voice mail for the family.

The parties do not dispute that this evaluation never occurred. After the District made the necessary arrangements with a mutually-agreed-upon evaluator, it was incumbent on the Parents to schedule the IEE. Until they did, there was nothing that the District could fund under the agreement. To the extent, as the Parents' brief states, that "[t]here is simply no evidence that the District has fulfilled its obligation under the contract[,]" it is because there was no obligation to fulfill. The parents did not prove a breach of the contract by the District. The trial court properly so ruled. Because that ruling was one on the merits—including an analysis of the evidence presented—the dismissal was properly granted with prejudice.

Affirmed.

WE CONCUR:

_____                    _____
                                           Dwyer, J.

_____                    _____
                                           Appelwick, C.J.